# EDWARD GILPIN v. THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF WILMINGTON AND BRANDYWINE.

High Court of Errors and Appeals.   August, 1824.

*Anonymous.**

---

* This report of this case written in a contemporary hand was found in the back of a notebook of uncertain origin, received by the Harvard Law Library, June 1, 1922.  The earlier pages of this notebook contain a transcript in a different hand, of the first 252 pages of *Bayard's Notebook*, followed by a transcript of the first 31 pages of *Wilson's Red Book*.

The report is inserted here with Ridgely's reports of cases heard in August, 1824.

The date given above, although probable for the beginning of the proceedings in the High Court, cannot be that of the judges' opinions; "Judge Rowland," mentioned in the last paragraph of Chief Justice Johns' opinion, was not appointed a judge of the Supreme Court until June 5, 1827.

92

[*Charge to the jury.*]

CHIEF JUSTICE BOOTH. The state of this case appears to be that Edward Gilpin, the defendant, had indorsed notes which were discounted by the Bank and remained unpaid by the makers of the notes to the amount of $6,910, and for which sum he became responsible to the Bank. To satisfy or pay the amount of these notes and as a security for that payment, he made an assignment to the Bank on July 21, 1817, of a mortgage executed by John Smith and Joseph Gilpin and Sarah, his wife, dated September 10th 1816 for the payment of $6,930 on the 21st day of the same month. The claim of the Bank sought to be recovered in this action is $6,910 with interest from July 21, 1817 deducting the sum of $3,507.08 the amount of monies arising from the sale of a moiety of the mortgaged premises on the 31st July, 1819, the other moiety having been previously sold by the late sheriff. In this case two questions will arise: first, as to the liability of Edward Gilpin, the defendant; and second, whether there exists any fact or circumstance in this cause that can exonerate the defendant from his liability.

It is contended by the defendant's counsel that the defendant, Edward Gilpin, is not liable because he knew not of his rights when he made the assignment; that he knew not that he was discharged as indorsor by the laches or negligence of the Bank in not giving notice of the non-pay-

ment of the notes by the makers. Now, whether the notice was or was not given in time has not been inquired into and does not appear to the Court. The protests that have been read in evidence appear to have been made in the usual manner and form and at the usual time; but whether the notice was given or not we consider to be immaterial and unnecessary to be inquired into in this action. But it may be proper to observe that if an indorsor makes an engagement or promise to pay as he did by making the assignment aforesaid under a knowledge of all the circumstances, it is a waiver of a want of notice.

This action is not brought against Edward Gilpin as the indorsor, but against him as the assignor of the bond and mortgage aforesaid. In the assignment he made he acknowledges he executed it for a valuable consideration paid to him by the Bank, that it was done to relieve him from his indorsements of the notes. If, therefore, the consideration for which the notes were given up and the compensation intended to be made by assignment of the bond and mortgage aforesaid has failed without any default on the part of the Bank, Edward Gilpin, the defendant in this action, is responsible for the amount of said failure.

The assignment of the bond and mortgage to another for a valuable consideration creates an obligation or implied undertaking on the part of the assignor to pay if the amount cannot be recovered of the obligor or mortgagor, provided there is no stipulation of the parties to the contrary either expressed or implied, and provided that the assignee has used due diligence to recover the amount. It would be impracticable to define what shall be deemed or constitute due diligence because it must always depend on the circumstances of the case and we consider the question of due diligence to be a question of fact for the consideration and determination of the jury under all the circumstances of the case. If the jury, when they consider all the facts in evidence, believe that the plaintiffs have used due diligence, that is the diligence which a prudent man attentive to his interest would have used, then the plaintiffs ought to recover.

The plaintiffs' counsel alleged that, at the time of the assignment of the bond and mortgage aforesaid, the defendant promised to make good any deficiency that might arise from the insufficiency of the bond and mortgage, and that the evidence supports the allegation. Therefore if the jury consider there is such evidence, and they believe

the evidence, that the defendant did make such promise or engagement, this establishes the liability of the defendant and renders an inquiry into the question of due diligence unnecessary. It has been attempted to be shown to the jury that Smith and Gilpin were insolvent at the time their bond and mortgage were assigned by the defendant to the Bank. If the evidence adduced at the bar satisfies the consciences of the jury that John Smith and Joseph Gilpin were insolvent at the time of the assignment aforesaid and continued so, this insolvency would be a justification of the plaintiffs not suing out process or taking other measures against them because in that case such proceedings would be fruitless and the law requires no one to do that which is vain and nugatory.

It has been insisted by defendant on behalf of defendant that the whole of the mortgaged premises should have been sold by the Bank, because the sale under a judgment did not disturb the lien created by the mortgage and the sale of the moiety under Kirk's judgment should have been made subject to the mortgage. This as a general principle we admit, but we consider that it can be of no avail to the defendant in this action because upon a sale of land all judgments prior to the mortgage must be paid and satisfied before any part of the monies arising from the sale can be applied to the mortgage and because Edward Gilpin, the defendant, was the purchaser of the moiety so sold for the sum of $2,900. The jury will therefore consider whether the monies arising from the sale of the moiety aforesaid were not all absorbed by the judgments which were prior to the mortgage. If so, the objection cannot operate against the plaintiffs' claim.

In the case which the jury is now called upon to decide, several questions will present themselves for consideration: first, whether Edward Gilpin, the defendant, made any promise or engagement to make good any deficiency that should arise from the bond and mortgage aforesaid; second, whether John Smith and Joseph Gilpin were insolvent at the time of the assignment aforesaid; third, whether the plaintiffs used due diligence in their proceedings on the bond and mortgage aforesaid. If these points are established in the affirmative in the opinion of the jury then they should find for the plaintiffs; or if the jury should be of the opinion that the two first mentioned points are not supported by the evidence but believe that due diligence has been used by the plaintiffs they ought to

find for plaintiffs. But if the jury believe that the promise or engagement by Edward Gilpin has not been established, and that Smith and Gilpin were not insolvent, and that the Bank has not used due diligence, then they should find for the defendant.

When the court had delivered the foregoing charge to the jury and immediately after the conclusion thereof, the defendant's counsel presented to the court a written paper of the following tenor, requesting the opinion of the court charging the jury upon the question stated in said paper, *viz*: If the jury shall be of the opinion that the Bank might have recovered the whole or a material part of the debt by entering judgment on the bond and suing out execution to the November Term, 1817, whether in point of law there was not want of due diligence in omitting to do so.

The court having delivered the opinion to the jury that the question of due diligence is a question of fact for the jury to decide, considers that opinion to involve and to be an answer to the question now propounded. The court also considered that the defendant's counsel had during the whole trial contended that the question of due diligence was a question of fact for the jury to decide. The whole current of their arguments was to this effect, and the opinion of the court was not requested on any question or point of law by the counsel on either side during the course of the trial; the court therefore declined giving any other opinion than what had been delivered relative to the question propounded. But the court did then further declare to the jury that if they should be of the opinion that part or portion of the whole sum claimed was lost or not obtained through the negligence or by the want of diligence on the part of the Bank then such loss should be deducted and their verdict be for the residue, and with that charge left the same to the jury; and the said jury then and there gave the verdict for the plaintiff.

Whereupon the said counsel for the defendant did then and there in behalf of the said defendant except to the said opinion and the charge of the said Justices. And the court signed the bill of exceptions which appear here on the record sent to this court. The plaintiff in error assigned upon the record sent up to this Court twenty four errors whereby in one form or other the whole charge of the court was excepted to.

THE CHANCELLOR. I shall in the first place advert to the charge as to the question of due diligence. The court states that the action was brought against Edward Gilpin as the assignor of

the bond and mortgage and that in the assignment he acknowledges he executed it for a valuable consideration paid to him by the Bank and that it was done to release him from his indorsement of the notes. If, therefore, says the court, the consideration for which the notes were given up and the compensation intended to be made by the assignment of the bond and mortgage to the Bank, has failed without any default on the part of the Bank, Edward Gilpin, the defendant, is responsible in an action for the amount of such failure. The assignment of a bond or mortgage to another for a valuable consideration creates, continues the court, an obligation or implied undertaking on the part of the assignor to pay, if the amount can not be recovered of the obligee or mortgagee, provided there is no stipulation of the parties to the contrary (whether expressed or implied), and provided too, that the assignee has used due diligence to recover the amount.

It was first settled by a judicial decision in the Supreme Court in Kent County in the year 1796, in the case of *Graviston v. Freeman* that the assignor was liable in an action for money had and received in the case the money due on the bond could not be recovered from the obligor, upon the principle stated by the court in this cause that the money or compensation paid the assignee to the assignor for the bond assigned was paid without a valuable consideration. And the court then said in substance, as the Court of Common Pleas here has said, that a valuable consideration being paid by the assignee creates an obligation or implied undertaking on the part of the assignor to repay the money or compensation given upon the assignment if the money due or to be paid on the bond cannot be recovered. The Court of Common Pleas added, without any default on the part of the Bank. However, notwithstanding the language of the Court of Common Pleas here cited, it is not to be understood when taking with the rest of the charge, to mean unless the bond be sued or prosecuted speedily, the assignee can not recover the money paid upon the assignment.

Here were two specialties assigned by Edward Gilpin on the 21st July 1817 to the Bank: one a bond and the other a mortgage; both dated September 16, 1816. Both were given by John Smith and Joseph Gilpin to Edward Gilpin for the same consideration; and both were assigned by Edward Gilpin to the Bank. Though they were different instruments they were both given to secure to Edward Gilpin the amount of the notes which he had indorsed for Smith and Gilpin, and they were both assigned to the Bank by Edward Gilpin to satisfy those notes, and discharge him from his liability as indorsor. The bond and mortgage re-

lieved Smith and Gilpin from their liability to Edward Gilpin as indorsor; and they being assigned to the Bank discharged Edward Gilpin from the obligation created by the indorsements. Both assignments, not one alone, made Edward Gilpin liable in case of the failure of both securities. The Bank had both the bond and mortgage assigned to pay the same amount of money; and any default in the Bank in regard to the bond or mortgage operated to discharge the assignor from his liability on both assignments; for these securities were given and assigned to effect a payment or recovery of the same sum of money, so that if the mortgage failed the bond might be effectual, and a default in either operated alike to discharge Edward Gilpin from each and both assignments. The bond never was put in suit, nor was any legal remedy used by the Bank to enforce the payment or recovery of the debt on the bond. This was such a want of diligence on the part of the Bank as to discharge Edward from all liability created by the assignments.

In the opinion of the Supreme Court, in the case of *Kuth's Administrator v. Snow,* it was laid down that the assignor is liable if the obligee fails, provided due diligence has been used in speedily prosecuting legal remedies for the recovery of the money; but due diligence must be used or the assignee can revert to the assignor. This opinion is referred to by Chief Justice Read in the case of *Kuth's Administrator v. Snow* as having been the principle upon which the court decided in the case of *Graviston v. Freeman* that the assignor is liable in case of failure by obligor. The case of *Graviston v. Freeman* was first tried; afterwards, the case of *Kuth's Administrator v. Snow* in 1796, and the Chief Justice, in delivering the opinion of the court in the last mentioned case, stated that the counsel for Kuth's Administrator had referred to a case in the Court of Common Pleas where it was laid down that when it was proved that the obligor had no property, the same diligence was not necessary. But the court said, before the assignor can be made liable the assignee shall lose no time in proceeding and taking all legal means for the recovery of the money. This will depend on the particular circumstances; as to this case the court will consider the several defenses. And, after adverting to the pleas of discount and limitation, he said:

> We now pass to the third point. The first process against Smith was nine months and two days and the fourth term after the assignment, three terms having elapsed. The Court consider themselves in duty bound to say this proceeding has not been with that due diligence as to make the assignor liable. But the plaintiff contends that this lapse of time had no tendency to cause this debt to be lost owing to

Smith's insolvent circumstances; and a number of judgments and executions against Smith are exhibited to prove this and to satisfy the Court. 1 Esp.N.P. 55, *Bickersdike v. Bollman* is cited by plaintiff's counsel (here the judge reads the case).

This case is not analogous to the case before the Court which is founded on an assignment of a bond made by Smith to Snow under the Act of Assembly. No part of the bond had been paid although all the instalments became due 15th September, 1791. We are to consider the circumstances. Smith was well known to Kuth who had been security for Smith. It is presumed Kuth expected that he would get the money from Smith and it is incumbent on the assignee to take legal steps to recover. Here are nine months elapsed after the assignment before suit brought; the judgments and executions are debts of record. When we consider the situation of these parties, the circumstances, and knowledge Kuth had of Smith, the judgments being of record, and that Kuth took the obligation of Smith, it must have been under the expectation and chance of receiving the money from Smith. After Kuth did sue Smith the suit was not prosecuted with reasonable diligence. The suit was brought to August, 1790. No declaration was filed until June, 1795. We are therefore of opinion that the plaintiff cannot recover in this action.

Notwithstanding this charge the jury found verdict for the plaintiff. The defendant's counsel moved for a new trial and, after argument, Chief Justice Read delivered the following opinion of the Court:

The Court considers this right of action by the assignor against the assignee has been but recently established; and, considering the Act of Assembly [1 Del.Laws 117] by which specialties are made assignable for encouragement of trade and commerce and that the assignee is enabled thereby to support a suit in his own name; and it being found from experience to be a convenient means of commerce, these paper securities answering the end of money, the Court conceived it was their duty to put an end to that vexed question whether the assignee could sue the assignor. When the judgment was given, the Court heard much argument and good argument at the trial, and, having considered the several arguments, they held that under due regulations the right might be more beneficially used than refused. But well knowing unless proper regulations were established that it would be more pernicious than beneficial, in the case

of *Graviston v. Freeman* the Court said the assignee should use all due diligence to make the assignor liable, and that by giving delay through negligence or favor the inconvenience would be greater than the advantages.

Our Act of Assembly having strong resemblance to the Statute of Anne (making promissory notes negotiable and putting them on the footing of bills of exchange, as nearly as they would admit), it was natural enough to resort to precedents in England on similar transactions, our assignments being on such grounds.

The Court considered that a recent prosecution of the bond was necessary, either to have been begun the next term after the assignment or the second at furthest, when the terms were held four times a year; therefore the Court said last evening that this was a matter of law as to the delay of the suit against Smith; that the delay was such as operated against the right of remedy by the plaintiff against defendant. The Court being strongly impressed with the necessity of putting some control on this subject for the sake of certainty and security to the people at large, thought they should deliver the law to the jury.

The judges in England, speaking of the limitation of time to regulate actions by indorsees against indorsers said, it was highly necessary to control the question; that if it was to be determined by a variety of juries, it would be productive of uncertainty and, of course, inconvenience; and therefore it ought to be considered a rule of law to be binding in all cases which might follow. It is in the power of every man, at least resident in the state, as well to make the attempt to receive his money as afterwards to pursue his action in a reasonable time. The Court will not undertake to say what is a reasonable time; and we are not called on in a way as to make it necessary to now limit the time, neither are we situated as the judge in Pennsylvania, [1] Dall. 252. There the motion was a nonsuit. Hearing the whole evidence in this case and stating our opinion, that too much delay had existed to entitle the plaintiff to his remedy, the Court will have it in their power by granting a new trial to hear the opinions of the other twelve men, and we do not conceive that we will by this be taking the case from the jury.

So a new trial was ordered. After the death of Chief Justice Read this cause was tried before Justice Johns and his associates and it is believed the jury found a verdict for the plaintiff on

proof being made by plaintiffs that the delay in suing Smith, the obligor, was occasioned by Snow, the assignor.

I have introduced this case of Kuth's Administrator at large because in it and *Graviston v. Freeman* were first laid down by any court in this state within my knowledge any principle in relation to suits by the assignee against the assignor for the recovery of the consideration of the assignment of a specialty on the failure or inability of the obligor to pay the debt mentioned in the specialty assigned. The case of *Cummins and Kennard v. Smith* in the Supreme Court in the year 1816 was decided on a variety of circumstances; but in that cause a suit was instituted against the obligor and in this particular is unlike this case in which no action was ever commenced by the Bank on this assigned bond against the obligors.

In *Deputy v. Bradley,* in the Court of Common Pleas for Sussex County, it is said to have been ruled that insolvency at the time of the assignment is a sufficient excuse for not bringing a suit. In *Darrow v. Hanver,* heard October 24, 1821, at an adjournment of the regular term of this Court, a judgment was rendered by the Court [which] laid down no principle in their decision which could stand as a precedent or which could or should influence their own judgment in any future case, leaving the whole subject as to suits brought by the assignee of a specialty against the assignor, entirely open for this Court to decide uninfluenced by any case which has been heretofore before the Court. It is true in that case, as the record stands, it seems as if the Court had settled the point so as to make it a rule for the government of other cases; but no such thing was intended by the Court, and the reasons of the Court do not appear on the record and the Court designed to leave every question on the assignment of specialties open for a more serious and solemn decision.

*Clark v. Young and Company,* 1 Cranch 181, is a case which was decided by the laws of Virginia and it seemed to be a principal question whether the assignor or indorsor of a negotiable promissory note should be answerable to the indorsee unless a suit were brought against the maker, he being a known insolvent. The Chief Justice then said the condition annexed to the receipt of a note cannot be presumed to have required that a suit should be brought against a known insolvent, or that it should be brought against the will of the indorsee. If he chose to dispense with it or took measures to prevent it, nothing can be more unreasonable than that he should be at liberty to avail himself of a circumstance occasioned by his own conduct. It is not intended to say that the person receiving such a note is compellable with-

out special agreement to sue upon it in any state of things. It is not designed to say that he may not on its being protested return it to the indorsor and resort to his original cause of action. It is only designed to say that under the circumstances of this case, nothing can be more clear than that there is no obligation to sue.

To understand this case it should be carefully read. A suit had before been instituted in Fairfax County in Virginia against Clark on his indorsement of this note, upon the trial of which cause the court ruled that the plaintiffs, Young and Company, could not maintain this action against him previous to their having commenced a suit and obtained a judgment against the maker of the note and until his insolvency should appear. The suit in 1 Cranch 181 was an action for goods sold and delivered by Young and Company to Clark. The note had been assigned or indorsed to Young and Company in payment for these goods and it is in reference to this suit the Chief Justice said, "The condition annexed to the receipt of the note cannot be presumed to have required that a suit should be brought against a known insolvent." And that it is only to say that under the circumstances of this case nothing can be more clear than that there was no obligation to sue. The indorsement of the note, [the Chief Justice said,] was not intended as an absolute payment for said goods nor received as such by plaintiffs, but merely as a conditional payment; yet the defendant below contended that the receipt of the said note under such circumstances, and the institution of the said suit by Young and Company in Fairfax County against Clark upon his indorsement, made the note so far a payment to the said plaintiff for said goods as to preclude them from maintaining any action against said defendant for said goods until they had taken such measures against Edgar [the drawer] as the laws of Virginia required; and the plaintiffs, Young and Company, having instituted the said suit upon the said note against the defendant and having been decided against said plaintiffs, they were barred from sustaining this action against said defendant. The Chief Justice further remarked that in Fairfax the point decided was that the suit against the indorsor would not lie until a suit had been brought against the drawer; in the suit in Alexandria (the action on the case for goods sold and delivered) the point decided was whether the plaintiffs had lost their remedy on the original contract, by their conduct respecting this note. These were distinct points and the merits of the latter were not involved in decision of the former.

Had the suit here been brought against Edward Gilpin as the indorser of the notes and he had insisted on the assignment of the mortgage and bond as a satisfaction and then if a question

had arisen whether the plaintiffs could maintain an action against him previous to their having entered a judgment and sued out an execution on the bond, the case in Cranch would have been applicable to such supposed suit, but according to Chief Justice Marshall the points in such a suit as that and this would be distinct and the merits of such supposed suit would not be involved in the decision of this. The suit instituted by Young and Company in Fairfax County on his indorsement of the note goes to show that according to the opinion of the Court this action could not be maintained unless the Bank had commenced a suit or entered a judgment and sued out execution against John Smith and Joseph Gilpin and their insolvency had appeared by such proceedings. And in the case in 1 Cranch 181, the decision in Fairfax County is not questioned, and the suit in the action brought for goods sold and delivered is governed by its own peculiar circumstances, and cannot and ought not to operate upon a distinct point and against the solemn decision of the Supreme Court in the cases of *Graviston v. Freeman* and *Kuth's Administrator v. Snow.* In Doug. 496, the Attorney General in his argument said that it had been frequently ruled by Lord Mansfield at Guildhall that it is not an excuse for not making a demand on a note or bill or for not giving notice of non-payment that the drawer or acceptor has become a bankrupt, as many means may remain of obtaining payment by the assistance of friends and otherwise. The court, in their decision of the motion for a new trial on the misdirection of the judge, made the rule absolute on another point on which the direction was wrong and said it was needless to go into this.

In *De Berdt v. Atkinson,* 2 H.Bl. 336, Justice Buller refers to the decision of Lord Mansfield and says that the insolvency of the drawer does not take away the necessity of notice when value has been given, but [he goes] no farther. This doctrine has been confirmed in *Nicholson v. Gouthit,* 2 H.Bl. 609, in the case of a known insolvent, when the Chief Justice said and the other Justices agreed, that a known bankruptcy was not equivalent to a demand or notice. The case of *Warrington and another v. Furbor and Warrington,* 8 East 242, was not a case depending on any general rules in relation to the acceptance of bills of exchange or to the indorsement of promissory notes, but it was a case of a guarantee. The contract required no act to be done by the creditor to make the guarantees liable, and they were in no form nor in any way parties to the bills of exchange, and no notice of the non-payment of it was necessary for they were bound by their previous written engagement. They stood more like securities in a bond without any notice or proceeding what-

ever, for the payment of the money. And the court there distinguished between guarantees and acceptors of a bill.

The proof given in this cause of the insolvency of John Smith and Joseph Gilpin, the obligors in the bond, is not sufficient to charge Edward Gilpin, the assignor of the bond, with the amount of the money due or payable upon this bond, because it does not appear that any legal means were used by the Bank for the recovery of the money secured to be paid by the bond. In every assignment of a specialty there is an implied undertaking of the assignor that if the money due or secured to be paid cannot be recovered of the obligor, provided there is no stipulation of the parties to the contrary (either express or implied), that the assignor will pay or satisfy the same to the assignee. But then there is a condition in law annexed to such undertaking that the assignee shall use legal means with due diligence for the recovery of the money of the obligor.

And such a condition involves the assignee in no risk or uncertainty, for he has only to use the legal means in due time and the failure will inevitably fall on the assignor. When the specialty is assigned the law gives full power to the assignee, his executors and administrators in his own name or names to sue for and recover the money contained in any specialty so assigned. This authority to recover the money is completely in the hands of the assignee, and the assignor is entirely divested of all right, power or authority over the same, and cannot coerce the payment of the money. It is incumbent upon the assignee to use all the means which the law affords before the assignor can become liable. There is no other mode to recover money contained in a specialty, and if the assignee will not do so he discharges the assignor from his implied undertaking and takes upon himself the risk of recovery or failure. He is not to say in the first instance that the obligor is insolvent, and to recur to the assignor upon his implied undertaking, because the implied condition in every such assignment (unless it be otherwise agreed) requires him to use all legal means with due diligence for the recovery of the money. There is no question here as to due diligence because it does not appear that the payment of the money has ever been enforced by any legal proceedings against the obligors upon this bond.

As the assignor cannot sue or compel the payment of the money; it is not unreasonable in him to insist that the assignee shall use all the means which the law affords to collect it of the obligor before the money or consideration given or paid for the assigned bond shall be taken as money paid without any consideration which has failed. If the performance of a condition has

failed and become improbable by the act of God, the performance is excused. So if the condition is not performed by the act of the party who creates it. As when the condition of a bond was that *A* and his wife should in Easter Term next after the date of the bond levy a fine to *B*. Lord Hobart said that in this case *B* was bound to sue out a writ of covenant, otherwise the condition was not broken. So here where the Bank did not proceed at law upon the bond, no obligation was created by which Edward Gilpin can be compelled to pay to the Bank the consideration given or paid for the bond and mortgage. For the Bank by not proceeding on the bond broke the condition upon which the bond and mortgage were assigned by Gilpin and taken by them, that is, that the bond and mortgage should be both enforced by suit or by other legal means according to the nature of those instruments and then on failure of the Bank upon such proceedings, that the assignor should be charged with the loss.

The opinion which I have formed arises from the Act of Assembly about assigning specialties [1 Del.Laws 117], and from the nature of the transaction. And in this case, from the testimony of Mr. Hay, as recorded in the bill of exceptions in the negotiation about the assignment of this bond and mortgage, members of the Bank and Edward Gilpin had the question as to the risk of collection of the money mentioned in their specialties, under consideration, and these notes were given up on the liability of Gilpin upon his assignments,—the Bank considering the assignment as equivalent to the indorsement of the notes. But the liability of Gilpin did extend beyond the obligation which the law imposed upon him, that is, that he should make good any deficiency which might appear, the assignees using due diligence in enforcing the collection of the money recoverable upon these specialties by the use of legal means.

If the plaintiffs below meant to rely upon a special agreement[1] they were bound to state [it] in their declaration; and upon the general count alone in the declaration they could not prove a special contract.[2] This supposed additional engagement of Edward Gilpin forms no excuse and lays no grounds for a recovery in this action, unless it had been charged in the declaration and made part of the case in the pleadings. As I concur in the opinion of the Supreme Court, as delivered by the Chief Justice Read, that before the assignor can be made liable, the assignee shall lose no time in proceeding and taking all legal means for the recovery; and as it does not appear that any proceeding were had

---

1 Manuscript reads "argument."

2 Manuscript reads "he could not prove special a contract."

by the assignee upon the bond, the assignee cannot recover in this action as the case here appears by the record returned to this Court.

And because the court in their charge to the jury said, that the plaintiffs' counsel allege that at the time of the assignment of the bond and mortgage aforesaid the defendant promised and engaged to make good any deficiency that might arise from the insufficiency of the bond and mortgage; and that the evidence supports this allegation; and then directed, if the jury consider there is such evidence and they believe the evidence that the defendant did make such promise and engagement, this establishes the liability of the defendant and renders an inquiry into the question of due diligence unnecessary. And again directed the jury that if the evidence adduced at the bar satisfies the consciences of the jury that John Smith and Joseph Gilpin were insolvent at the time of the assignment aforesaid and continued so, this insolvency would be a justification of the plaintiffs in not suing out process or taking other measures against them because in that case such proceedings would be fruitless, and the law requires no one to do that which is vain and nugatory. The charge or direction to the jury in these particulars was erroneous. For, as this case appears from the record, nothing less than the use of legal means for the recovery of the money mentioned in the bond from the obligors and the failure thereupon entitles the Bank to recover of Edward Gilpin the consideration paid or given by them for the assignment of the said bond and mortgage. The insolvency of the obligors as this case stands could be established only by proceedings upon the bond and mortgage and, as it does not appear that the assignees took any legal means to enforce the payment of the bond, they have failed and Edward Gilpin is not liable to answer over to them as the assignor.

My remarks apply to this special case, and to the neglect of the assignee in omitting to proceed upon this bond. The court have further said in their charge to the jury, "We consider the question of due diligence to be a question of fact for the consideration and determination of the jury under all the circumstances of the case. If the jury, when they consider all the facts in evidence, if they believe that the plaintiffs have used due diligence, that is diligence which a prudent man attentive to his interests would have used, then the plaintiffs ought to recover." And throughout the whole charge the question of due diligence is treated as a question of fact for the jury alone to decide.

Here again the charge is erroneous. The question of due diligence is either a question of law, or it is a mixed proposition of

law and fact. Whether the circumstances alleged to show that due diligence has been used are true and existed, is a matter of fact; but whether, supposing them to be true they amount to due diligence, is a question of law. Due diligence, reasonable time, probable cause, in malicious prosecution and suchlike cases depend upon the same principle.

In Co.Litt. 56b, this case is stated: if a man seised of a messuage in fee and has certain goods in said house and makes his executors, and dies, the executors shall have reasonable time to carry out the goods of the testator. "This reasonable time," Lord Coke says, "shall be adjudged by the discretion of the justices before whom the cause dependeth; and so it is of reasonable fines, customes and services, upon the true state of the case depending before them: for reasonablenesse in these cases belongeth to the knowledge of the law, and therefore to be decided by the justices. (Bract. li. 2, ca. 52b) *Quam longum esse debet non definitum in jure, sed pendet ex discretione justitiariorum.* And this being said of time, the like may be said of things incertaine, which ought to be reasonable; for nothing that is contrary to reason, is consonant to law." This doctrine is supported by Cro.Jac. 204, *Hobart v. Hammond,* 460, 276. Tri. per Pais 12, 231. 22 Vin.Abr. p. 5, 6, 7, 5.[3] Com.Dig.,[4] title "Temps," who says, "what shall be reasonable Time, the Justices are to determine."

In the modern decisions in England the question has been often discussed and the result of the cases is, that due diligence or reasonable time is a question of law, or a question of law and fact; that the facts being ascertained, or there being no dispute about them, reasonable time or due diligence is a question of law; but when matters which are partly law and partly fact are in issue, and the evidence has been laid before the court and jury, the court shall direct the jury how the law is, and if they find contrary to such direction it is a sufficient reason for a new trial. The cases upon this subject are *Eaton v. Southby,* Willes 131; *Bell v. Wardell,* Willes 202; *Chamberlyn v. Delarive,* 2 Wils. 353 (and this case last mentioned in principle is extremely like the present one); *Tindal v. Brown,* 1 Term 167. *Darbishire and another v. Parker,* 6 East 3, in which I refer particularly to the opinion of Justice Grose and Justice Lawrence, the latter of whom says,

"As to whether reasonable notice be a question of law or fact, it must be recollected that the facts stated in the re-

---

[3] An unintelligible reference; Viner's article on "Time" is in Volume 20, pp. 266–277.

[4] The manuscript here contains the unintelligible reference, "334."

port of *Tindall v. Brown* were afterwards found in a special verdict, in which the jury did not find whether the notice were reasonable or not; on which special verdict this Court gave judgment for the plaintiff, and that judgment was unanimously confirmed in the Exchequer-chamber. But if reasonable notice were a question of fact and not of law, I am at a loss to know how those judgments are to be sustained; for the jury did not find the fact of reasonable notice, but left that as a question of law, to be inferred from all the circumstances. But if it were a question of fact, there ought to have been a *venire de novo* in that case."

Then he adverts to the case in Willes, 202, and the practice on trials for crimes. Afterwards arose the case of *Parker v. Gordon,* 7 East 385, and there, where there was no dispute about the facts in action by the indorser of an inland bill of exchange against the drawer, what was sufficient proof of notice of nonpayment by the drawee was settled by the court as a question of law; and this case occurred after those mentioned in the notes in 6 East.

In the case of *Kuth's Administrator v. Snow,* Chief Justice Read, after adverting to the facts given in evidence, said explicitly in the charge to the jury, "We are therefore of the opinion that the plaintiff can not recover in this action." And afterwards, on the motion for a new trial, [he] said as to the due diligence that it was a matter of fact; as to the delay of the suit against Smith, that the delay was such as operated against the right of remedy by plaintiff against the defendant and the court considered themselves as in duty bound to say that this proceeding has not been with that due diligence as to make the assignor liable.

All the reasoning of the court in *Kuth's Administrator v. Snow* is alike conducive to the interest of the assignors and assignees. It establishes with some degree of certainty the law upon the subject, producing uniformity of decision; and does not leave it to fluctuate upon the opinions of various juries. If this is a matter for the determination of juries then all such cases are placed without remedy, however erroneous such decisions may be; for if it belongs entirely to a jury to decide what is due diligence I do not perceive with what propriety a court can set aside a verdict and grant a new trial, unless in very flagrant cases; as no rule could be established by which assignors and assignees could govern themselves upon the assignment of specialties. The assignment of specialties seems to be more particularly than other cases within the province of the

court, as the prosecution of a suit may appear upon record testimony, and then if there be any excuse for not having done so the Court may judge of the excuse and instruct the jury thereupon. When it is made a question of law and fact according to circumstances, the court and juries continue in their departments; certain rules will be established and become well known and the assignment of specialties will answer the purpose intended by the legislature.

It has been objected against the plaintiff in error in the argument of this case (in this court by the counsel of the defendant in error), that the counsel of Edward Gilpin, the plaintiff in error, treated this case in the Court of Common Pleas in their arguments on the trial of the issues there joined, as a question of fact to be decided by the jury. However the counsel for the defendant in the Court of Common Pleas may have managed the matter in their arguments on the trial of the issues before the jury, it is presumed that they followed the course which the counsel for the plaintiff in that court took and thereby prescribed, in order to repel the arguments of the plaintiffs and to make the best of their case according to the testimony given to the jury. But the case here is not to be decided by the manner of conducting the cause by counsel in their argument, for they must meet the case according to circumstances.

If any agreement had been made, if any act had been done, this Court upon its being placed here on the records could have judged upon it. But to decide upon a cause in this Court upon the arguments of counsel in a court where issues are tried under all the variety of testimony there given, and different modes of managing and debating a cause on such occasion (and specially if the opinions of a court can be anticipated), would put insurmountable difficulties upon gentlemen of the bar. When manifest error has happened "to the great injury of the defendant," as the writ supposes, and, to use technical language, "by the default of the Court," it may be assigned for error. The law cannot be altered by any arguments of counsel. *William, the heir of William, v. Gurgh,* [——][5] 42, 43, 47. Error may be released; there may be an agreement not to bring a writ of error. But where the directions of the court are deemed to be erroneous, and those directions may have produced the verdict upon which the judgment has been rendered, it is a fit case for the ultimate decision of this Court.

For these reasons, I have adjudged that the judgment should be reversed.

[5] Blank in manuscript.

CHIEF JUSTICE JOHNS. I concur in the opinion that the judgment ought to be reversed for errors in the charge of the Court of Common Pleas to the jury. There are two errors in the charge as to which I entertain no doubt.

First, the court decided the question of due diligence by the assignee of the bond to be a question of fact for the jury to decide. This is error for in this case it is a mixed question of law and fact and the court ought to have decided the law and have submitted the facts to the jury. In other words, the court should have declared to the jury whether, supposing insolvency not to be an excuse for the assignee's not proceeding to use legal means to recover the debt and no execution issuing on the bond, the law was that due diligence had not been used, and that this discharged the assignor from his conditional liability. Or, if the court was of the opinion that insolvency at the time of the assignment or at the time when an execution could have been issued on the bond was any excuse, or rendered it unnecessary for the assignee to proceed on the bond for the purpose of preserving the assignee's right to resort to the assignor for the recovery of the consideration of the assignment, then the court ought to have decided the law to be so and left the fact only of insolvency to the jury. It was error to submit to the jury to decide the question of law as to due diligence: first, because the court are bound to decide questions of law if necessary to be decided and the questions are made in the case; and secondly, if on account of insolvency the question of due diligence is immaterial, then the court ought so to have decided.

That the question of law as to due diligence should be decided by the court, I consider is established by English authorities and the decisions of the United States Courts. But if there was a doubt, the decisions of the courts in this state ought to settle the question. In *Kuth's Administrator v. Snow,* Chief Justice Read decided the question as to what was due diligence: that a suit must be brought and prosecuted diligently or there would be a want of due diligence and the assignor would be discharged. A verdict for the plaintiff was set aside and a new trial granted. It appeared that three terms elapsed before suit against obligor and two years before *narratio* filed.

The same cause was tried in the Supreme Court, October Term 1799, before Chief Justice Johns and John Clayton. It was a suit on the assignment of a bond of James Smith's to James Snow by Thomas Kuth. The bond was dated, January 6th, 1788, the assignment was dated 29 October 1792. Thomas Kuth commenced a suit on the bond against Smith on the 1st August 1793; May

25th, administrator of Kuth made a party; December 5th, 1795, judgment. December 12th, 1795, *fieri facias* issued, returnable to May, 1796. Returned, *nulla bona*. November Term, 1796, Smith petitioned and was discharged as an insolvent, and there was parol testimony as to the insolvency of Smith. Among other grounds of defense, a want of due diligence was relied on, to which Mr. Bayard, counsel for the plaintiff, answered, admitting that in the case of *Graviston v. Freeman* in the Supreme Court, a suit by an assignee against assignor, it was established that an assignor was liable. He also admitted as a general rule that the assignee was bound to sue and that delay would release the assignor but contended that this case was an exception to the general rule on two grounds: first, the insolvency of James Smith at the time of the assignment; secondly, that Snow, the defendant, requested Kuth not to sue Smith without his orders, of which there was some slight testimony.

The court did decide the law as to what due diligence was. The general rule as to the liability of the assignor in the case of *Graviston v. Freeman* was recognized conditionally, that a suit was brought on the bond by the assignee in due time and prosecuted in common form. The court did decide that the suit if necessary must be brought to the next court after the assignment, and the court did decide that if there was an agreement on the part of the assignor that no suit should be commenced without his orders, it would except the case out of the general rule or excuse the not bringing the suit.

CHIEF JUSTICE JOHNS was then of opinion, if insolvency was admitted or proved, it would be an exception to the rule; but whether a technical or notorious insolvency was understood, or what kind of proof of insolvency was to be required he does not know that he then considered. In *Cummins and Kennard v. Solomon Smith,* in the Supreme Court, October Term, 1806, the court did decide what was due diligence as to the time when a suit must be commenced; and the taking a judgment with the stay of execution for four months could not be an objection to due diligence.

In the case of *Rumsey and Broom v. Smith,* in the Court of Common Pleas at May Term, it appears that the court did submit the question of due diligence to the jury, but whether the point was insisted on and the attention of the court called to it, or under what circumstances the opinion of the court was delivered does not appear. The case of *James Dyer v. Benjamin Harrow* in the Court of Appeals at an adjourned court, 1821, is relied on to show that the Court of Appeals have decided the question of

due diligence to be not a question of law, and a proper question for a jury to decide. It is true, from the record it may be inferred that the Court did so decide. But this was not the fact. I delivered the opinion of the Court, which was previously reduced to writing which I am now in possession of. This declared, we do not think it necessary [to decide] the question whether due diligence in this case is a question of law or fact, and ought to have been decided by the court and not left to the jury; because it does not appear from the bill of exceptions that this point was insisted on at the trial below, and if the point was not made, and the attention of the court called to it. We are of the opinion, as the court in the charge left the question to the jury to decide, whether it was a question of law or fact or a mixed one that is not an error for which this Court ought to reverse the judgment. In a case brought before us depending upon the question whether the court ought to decide the question or leave it to the jury to decide, then we shall have no objection to decide it.

This decision shows the Court of Appeals did not decide the question and I consider the decisions of the Supreme Court in the cases before mentioned ought to govern this case, as it respected the question whether due diligence is a question of law and to be decided by the court.

The second error in the charge of the court is that if there was a parol agreement at the time of the assignment by which E. Gilpin, the defendant, agreed to be answerable for any deficiency in consequence of the inability of the obligor to pay, that on this ground the plaintiff below was entitled to recover. I am of the opinion that on the general count in the declaration, the plaintiff could not recover on this ground. If there was any such special contract it should have been stated in the declaration.

Third point. There is a third point which presents two questions: first, whether insolvency will supersede the necessity of bringing a suit and prosecuting it with due diligence; secondly, if yes, what species of insolvency and what kind of proof is required. As to the question of insolvency in the charge of the court, it is stated that if the evidence satisfies the conscience of the jury that John Smith and Joseph Gilpin were insolvent at the time of the assignment and continued so, this insolvency would be a justification to the plaintiff in not suing out process or taking other means against them. I am of the opinion there is error in this part of the charge. Insolvency in this case is a mixed question of fact and law and the court should have decided what is legal insolvency and left the facts only to the jury; that is, supposing insolvency to be sufficient to entitle the plaintiff to recover without having sued on the bond.

In the consideration of the question of insolvency, I have endeavoured to ascertain what the law is, as well from my recollections of the opinions prevalent at the bar, as from the decisions of the Courts of Delaware. At the close of the Revolutionary War and afterwards, the scarcity of specie and want of money occasioned much traffic in bonds and notes. They were bought and sold and used as a substitute for money. Before the adoption of the Constitution of Delaware, the liability of the assignor in case of the inability of the obligor to pay was questioned, and if liable the extent, or whether absolute or conditional, if conditional what were the conditions,—were doubtful questions. It was the general opinion that the assignor was liable and the practice was for the assignee to sue the assignor on failure of obtaining payment from the obligor. Some lawyers doubted whether the action could be maintained on the assignment. The practice of suing on the assignment continued without any decision that I know of, until 1796, when in the case of *Graviston v. Freeman* in the Supreme Court in Kent County, there was a decision; before which, the practice was for the assignee to sue the obligor and I believe the general opinion was that to make the assignor liable, it was considered to be necessary that the suit should be instituted to the next court after the assignment, but I do not believe that the universality of the principle was established so as to require the suit to be necessary in the case of a legal or absolute insolvency.

In *Graviston v. Freeman,* the liability of the assignor in an action for money had and received in case the money due on bond could not be recovered from the obligor, was established on the principle that the money presumed to be paid to the assignor for the assignment was a valuable consideration which raises an implied obligation on the part of the assignee to repay it in case of failure by the obligor. It might be inferred that the court in this case intend[6] recovery, if a suit was instituted and by such the debt could be recovered; but it is not so expressed. In *Kuth's Administrator v. Snow,* 1798, Mr. Ridgely, the counsel for the defendant did not consider the law as so settled, for insolvency was insisted on as one of the grounds of defense, and two cases were referred to (it is supposed, in the Common Pleas); one in Kent when it was admitted both by counsel and the court, that if the obligor was insolvent at the time of the assignment the assignor was liable. The second in New Castle, that even a suit was not necessary. But Chief Justice Read said that in *Graviston v. Freeman* when the right of

---

[6] Manuscript reads "intend by recovery."

action by an assignee was established the court deemed it important and so expressed themselves, that such right could only attach in such cases in which the assignee had or should use reasonable and due diligence to obtain the money from the obligor, the ultimate and necessary step being that of a compulsory suit at law.

In the same case, 1799 (see *ante*), as a general rule that the assignee must sue was admitted by counsel, but contended that insolvency is an exception to the general rule, and the court divided.

In the case of *Cummins and Kennard v. Smith,* decided in 1806 (see *ante*), Messrs. Clayton and Hall, *pro* plaintiff, Mr. Fisher for defendant, the ground of insolvency was relied on to entitle the plaintiff to recover without prosecuting a suit with due diligence. There was a judgment with stay of execution four months, and no execution issued until nine months had elapsed and five months after the stay had expired. Mr. Clayton contended that insolvency at the time of the assignment was sufficient. Mr. Hall, insolvency at the time of the judgment, and that as soon as the obligor became insolvent the liability of the assignor was fixed and that the assignee was not bound further to proceed in the suit against the obligor. The defendant's counsel insisted there was a want of due diligence because a *capias ad satisfaciendum* was not issued; and I remark there was no sale of the land. The case of *Rumsey and Broom v. Lofland,* in 1804, was cited in which it was decided by the Common Pleas that if the obligor was insolvent the assignee was not bound to sue the obligor. In this case against Smith, the court (Johns, C. J., and Cooper, J.,) recognized the general rule as to the right of the assignee to maintain a suit against the assignor on the ground that the assignment (if it was not otherwise agreed) was a conditional warranty to repay the consideration money, provided due diligence was used by the assignee and the debt could not be obtained from the obligor. It was also decided that the insolvency of the obligor at the time of the assignment would be sufficient to make the assignor liable in this case, and also that insolvency at the time when the plaintiff could have taken out execution would be sufficient to make the assignor liable and entitle the plaintiffs to recover.

The case of [*Deputy*] *v. Bradley* was cited by the respondents' counsel, decided by Common Pleas in 1817, in which it was alleged and not denied that, that court decided that insolvency was sufficient to make the assignor liable. If decisions in our own courts are to decide what the law is as to the question of insolvency, in both the Court of Common Pleas and the Supreme

Court, the liability of the assignor on the ground of insolvency at the time of the assignment was settled; for all the decisions affirm the principle except the case of *Kuth's Administrator v. Snow,* in 1798, which is at variance with and contradictory to all the other decisions; in that case the question as to insolvency was a point in the cause and the court did decide that a suit at law by the assignee against the obligor was necessary to make the assignor liable.

I confess that the great respect I have for the opinion of Chief Justice Read, the reason for requiring a suit to be instituted (which I understand to be the using legal means), and the inconvenience that might result from holding the assignor liable after he parted with the power of suing ·without requiring the assignee to sue, and the general practice of commencing suits by the assignees against the obligors,—afford ground to doubt. But when it is considered that the law does not require the assignee to do an act positively useless, as to sue an insolvent, and that although it may be a sound principle and good as a general rule, that the conditional liability of the assignor means that he is liable if the assignee·sues the obligor, prosecutes the suit with due diligence, and cannot recover; yet, like all general rules, it is liable to some exceptions. And the performance of conditions in some cases the law does dispense with or excuse: as, if the performance be prevented by the act of God; and so, if prevented by the act of the party for whose benefit the condition is to be performed as in the case of *Kuth's Administrator v. Snow,* where the assignor requested the assignee not to sue the obligor without his orders; and so also, if the obligor has no property, it seems to be unreasonable that the assignee should be bound to sue an insolvent when no effect can be produced.

The practice of suing by the assignee was a safe one, for, if the debt was not recovered, it furnished him with evidence to recover of the assignor. But, if insolvency could be proved and the assignee will take the burden of the proof, why should he not be permitted to recover on such evidence. When a technical insolvency may be proved where no suit has been instituted by the assignee, as when the obligor is discharged under an insolvent or bankrupt law or has made an assignment of all his property for the benefit of his creditors; and again, suppose there to be judgment and executions against the obligor at the suit of a creditor not the assignee, all the property is sold and not sufficient to pay the executions. This would be clear and certain proof of insolvency, and it would be unreasonable in such cases to compel the assignee to sue the obligor, whereby

he must subject himself to expense, trouble and delay, and recover nothing before he could commence a suit against the assignor. It is therefore my opinion that a case of a clear and absolute insolvency at the time of the assignment should be considered an exception to the general rule and that in such cases the assignee may maintain an action against the assignor. But, for reasons assigned (see *ante*), I consider the charge of the court as to this subject erroneous.

But, as I know three of the four judges, the Chancellor, Judges Davis and Rowland, sitting judges in this case have concurred in a different opinion, the law must now be considered to be settled; and that, if the assignee neglects to commence and prosecute a suit against the obligors, this will discharge the assignor from any liability to repay the assignee the amount of the bond even if the obligor was insolvent at the time of the assignment; which is conclusive as to the present cause for no such suit was instituted in the present case and consequently the plaintiff had no right of action.

And the judgment of Common Pleas must be erroneous and ought to be reversed.